# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| SHIRLONDA PORTER, | ) | CASE NO. 1:17CV0963 |
| | ) | |
| Plaintiff, | ) | JUDGE SOLOMON OLIVER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Shirlonda Porter, ("Plaintiff" or "Porter"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends the

Commissioner's final decision be VACATED and this matter REMANDED for further

consideration consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.  PROCEDURAL HISTORY

In June 2013, Porter filed an application for SSI, alleging a disability onset date of January 1, 2004 (later amended to June 17, 2013) and claiming she was disabled due to "diabetes; back injury; arthritis; pinched nerve in neck and shoulder; hernia; low vision; extreme legs, hands, and feet muscle cramps; numbness in hands, legs, and feet; migraines; and sciatic nerve pain."  (Transcript ("Tr.") 58, 168, 182, 187.)  The applications were denied initially and upon reconsideration, and Porter requested a hearing before an administrative law judge ("ALJ"). (Tr. 127- 129, 131-133.)

On September 23, 2015, an ALJ held a hearing, during which Porter, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 75-101.)  On November 17, 2015, the ALJ issued a written decision finding Porter was not disabled.  (Tr. 58-70.)  The ALJ's decision became final on March 10, 2017, when the Appeals Council declined further review. (Tr. 1-7.)

On May 7, 2017, Porter filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 13.) Porter asserts the following assignments of error:

(1)     The ALJ erred in finding that Ms. Porter's hand limitations are not severe impairments.

(2)     The ALJ's assessment of Residual Functional Capacity is not supported by substantial evidence.

(3)     New and material evidence exists and requires remand for additional evaluation of Ms. Porter's hand impairments and back pain and assessment of residual functional capacity.

(Doc. No. 12.)

2

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Porter was born in November 1964 and was 50 (fifty) years-old at the time of her administrative hearing, making her a "person closely approaching advanced age," under social security regulations.  (Tr. 69.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  She has at least a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a sales clerk.  (Tr. 68.)

### B.   Relevant Medical Evidence[2]

On May 17, 2011, Porter presented to Scott Feudo, M.D., for follow-up regarding "multiple issues including type 2 diabetes mellitus."  (Tr. 264-265.)  Among other things, Porter complained of cramping pain in her calves, as well as "a history of intermittent episodes of polyuria and polydipsia[3] times years."  (*Id.*)  Physical examination was normal aside from decreased reflexes bilaterally.  (*Id.*)  Dr. Feudo assessed the following: (1) hypertension; (2) gastroesophageal reflux; (3) type 2 diabetes mellitus; (4) nocturnal leg cramps; (5) migraines; and (6) osteoarthritis and degenerative disc disease of the lumbosacral spine with bilateral neuroforaminal stenosis.  (*Id.*)  Lab work showed high levels of glucose (198) and hemoglobin A1c (12.0).[4]  (Tr. 306, 308.)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3] Polyuria means increased urination, while polydipsia refers to increased thirst.  *See* Social Security Ruling 14-2p, 2014 WL 1472008 at * 2 (SSA June 2, 2014).

[4] Porter's treatment records indicate the normal range for glucose is 74 to 106. (Tr. 306.) These records further state an A1c level equal to or over 6.5 is "diagnostic of diabetes."  (Tr. 308.)

Porter returned to Dr. Feudo on November 21, 2011.  (Tr. 262.)  She complained of (1) constant throbbing pain just below her right breast; (2) polyuria and polydipsia; (3) intermittent episodes of tingling in the right hand; and (4) intermittent episodes of daily pain on the right side of her neck.  (*Id*.)  Examination revealed full range of motion with increased pain in Porter's neck and chest; decreased reflexes (1+/4) bilaterally; and negative Tinel's, negative Phalen's sign, and negative carpal compression in the right wrist.  (*Id*.)  Dr. Feudo diagnosed neuromuscular chest pain; hyperglycemia secondary to uncontrolled type 2 diabetes; right cervical radiculopathy secondary to right-sided neuroforaminal stenosis of the cervical spine, herniated disc; and possible compression neuropathy.  (*Id*.)  He ordered x-rays of Porter's chest and cervical spine, and prescribed Tramadol.  (*Id*.)  Lab work showed high levels of glucose (199) and hemoglobin A1c (11.2), as well as Vitamin D insufficiency.  (Tr. 297, 300, 303.)

Porter underwent an x-ray of her cervical spine on November 23, 2011, which found as follows: "Alignment is intact.  The vertebral body heights and the disc heights are preserved. The neuroforamina are patent."  (Tr. 330.)  On that same date, Porter underwent a chest x-ray. (Tr. 331.)  This imaging did not reveal any abnormalities in Porter's heart or lungs, but did show mild to moderate diffuse thoracic spine disc space narrowing and endplate osteophytosis, as well as thoracic spine scoliosis.  (*Id.*)

On August 8, 2012, Porter returned to Dr. Feudo with "multiple complaints."  (Tr. 260-261.)  Specifically, she reported "daily episodes of throbbing pain in the right lateral supraorbital region over the past few months."  (*Id.*)  Porter reported increased pain with head movement, as well as nausea, lightheadedness, photophobia, and phonophobia.  (*Id.*)  She also complained of "constant throbbing" pain over the right side of her neck radiating to her right upper arm, and

4

right upper extremity weakness. (*Id*.) In addition, Porter stated she had suffered from "chronic intermittent episodes of tingling throughout [her] entire right hand." (*Id*.) On examination, Dr. Feudo noted decreased range of motion in Porter's neck with increased pain, as well as tenderness to palpation. (*Id*.) He also found diminished sensation in Porter's right upper extremity, decreased reflexes, and 4/5 motor strength in the left upper extremity. (*Id*.) Dr. Feudo assessed hypertension, Vitamin D deficiency, type 2 diabetes, and attributed her chronic daily migraine headaches, neck pain, and right hand tingling to possible "right cervical radiculopathy secondary to herniated disc, right-sided neuroforaminal stenosis of the cervical spine." (*Id*.) He prescribed Neurontin and ordered an MRI of Porter's cervical spine and brain. (*Id*.) Lab work showed high levels of glucose (175) and hemoglobin A1c (9.3). (Tr. 287, 291.)

Several days later, Porter underwent an MRI of her cervical spine, which showed broad-based disc bulges at the C4-C5 and C6-C7 levels that narrowed the subarachnoid space but did not deform the spinal cord. (Tr. 251.) She also underwent an MRI of her brain, which was unremarkable. (Tr. 250.)

Nine months later, on May 7, 2013, Porter returned to Dr. Feudo with complaints of "pain and digestive issues." (Tr. 356-359.) She reported (1) constant sharp chest pain; (2) generalized fatigue; (3) "chronic constant throbbing pain" on the right side of her neck radiating to the right shoulder, increased with movement; (4) throbbing pain along the left side of her neck radiating to the left shoulder; (5) chronic intermittent episodes of tingling in her right hand; (6) intermittent episodes of throbbing pain "superior lateral to the right eye," lasting "hours or days" with phonophobia, photophobia, nausea, and lightheadedness. (Tr. 356.) On examination, Dr. Feudo noted abnormal heart palpation and sounds; tenderness to palpation of Porter's cervical spine;

decreased reflexes; and normal sensation.  (Tr. 358.)  He increased her Gabapentin dosage and stated Porter "may benefit from a rheumatology consultation." (Tr. 358-359.)  Lab work showed high levels of glucose (191) and hemoglobin A1c (12.4).  (Tr. 280, 285.)  It also revealed a high sedimentation rate of 66 (normal range 0-20), and elevated c-reactive protein.  (Tr. 279, 282.)

Porter returned to Dr. Feudo on November 19, 2013.  (Tr. 353-355.)  She complained of "aching, throbbing pain in both knees," as well as intermittent episodes of her left knee locking up or giving out.  (Tr. 353.)  Porter also reported sharp lower back pain radiating to her legs, as well as numbness in her bilateral feet.  (*Id.*)  On examination, Dr. Feudo noted full range of motion in Porter's lumbar spine with increased pain but no tenderness to palpation; full range of motion in her knees along with tenderness to palpation and crepitus; and decreased reflexes.  (Tr. 355.)  He prescribed Cymbalta and ordered x-rays of Porter's knees and an MRI of her lumbar spine.  (*Id.*)

X-rays of Porter's knees were negative.  (Tr. 403.)  The MRI of her lumbar spine showed the following:

> Alignment is intact, Marrow signal is normal. There are no compression deformities. The conus is normal in caliber and signal.  No focal abnormalities are appreciated at levels T12-L1 through L2-L3.  At the L3-L4 level, there is mild facet hypertrophy but there is no significant canal or foraminal stenosis. At the L4-L5 level, there is minimal disc bulging and facet hypertrophy as well as mild ligament of flavum hypertrophy.  There is no canal stenosis or right foraminal stenosis.  There is mild left foraminal encroachment.  At the L5-S1 level, there is minimal disc bulging and spurring as well as facet hypertrophy. There is no canal or foraminal stenosis.

(Tr. 398.)

On December 3, 2013, Philip Michalos, O.D., examined Porter and completed a Medical Report regarding her vision.  (Tr. 421-422, 510-512.)  He identified diagnoses of compound

hyperopic astigmatism OU, presbyopia OU, and meridional amblyopia OU.  (Tr. 421-422.)  Dr. Michalos noted these conditions cause mild blurring and opined they might cause Porter to have problems with "critical visual tasks," such as reading small print.  (*Id.*)

Porter returned to Dr. Feudo on January 16, 2014.  (Tr. 427-430.)  She reported (1) constant sharp pain in the mid-thoracic region; (2) chronic intermittent episodes of aching, throbbing knee pain as well as episodes of her knees "locking up" or "giving out;" (3) chronic intermittent episodes of numbness in her bilateral feet; and (4) chronic near constant sharp pain in her lower back.  (Tr. 427.)  On examination, Dr. Feudo noted full range of motion in Porter's thoracic and lumbar spines and knees with increased pain; tenderness to palpation in her lumbar spine and bilateral knees; crepitus bilaterally; and negative Lachman's test, negative McMurray test, and negative patellar apprehension test.  (Tr. 429.)  Dr. Feudo also found diminished sensation in Porter's right foot, and decreased reflexes.  (*Id.*)  He concluded Porter's knee pain was "possibly secondary to osteoarthritis, fibromyalgia, internal derangement such as torn menisci;" and found "possible etiologies" for her thoracic pain included osteoarthritis, degenerative disc disease, myofascial pain, and compression fracture.  (*Id.*)  Dr. Feudo referred Porter to an orthopedist for her knee pain, and ordered x-rays of her thoracic spine.  (Tr. 480.)  Lab work showed high levels of glucose (129) and hemoglobin A1c (11.6).  (Tr. 435, 437.)  It also revealed a high sedimentation rate of 28 (normal range 0-20).  (Tr. 438.)

On February 12, 2014, Porter presented to Dr. Feudo with complaints of pain in her left foot and toe after striking her foot on a table two days previously.  (Tr. 423-426.)  She also again complained of bilateral knee pain, foot numbness, lower back pain, and "intermittent episodes of nausea and sometimes headache."  (*Id.*)  Porter indicated her pain levels had decreased somewhat

7

since taking Cymbalta.  (*Id*.)  On examination, Dr. Feudo noted as follows:

> Thoracic spine and lumbar spine– no erythema or swelling. Full range of motion
> with increased discomfort noted in the thoracic region in all directions of motion
> with the exception of bending bilaterally.  Full range of motion in the lumbar
> spine with increased discomfort only on bending to the right.  Palpation of the
> mid thoracic region the level of T5-T6 revealed increased tenderness
> no increase in warmth.
>
> Knees– no erythema or swelling. Full range of motion with pain noted in the
> right knee on flexion and extension of the left knee. Palpation revealed crepitus
> bilaterally no tenderness or increase in warmth. Negative Lachman's test,
> negative McMurray test, negative patellar apprehension test.
>
> Left foot area of swelling and ecchymosis noted extending from the left fifth toe
> along the dorsal surface of the lateral end of the right foot.  Full range of motion
> with increased pain noted in all directions of motion.  Palpation of the entire
> region revealed increased tenderness no increase in warmth.
>
> Neurologic. Lower extremities– detailed neurological exam was normal except
> for the following.  Reflexes 1+/4 bilaterally.

(Tr. 425.)  He ordered x-rays of Porter's thoracic spine and left foot, and referred her to an

orthopedist for evaluation of her knee pain.  (Tr. 426.)

The x-rays of Porter's thoracic spine revealed mild disc space narrowing throughout the

spine, with moderate marginal ostephyte formation in the lower thoracic spine and small

marginal osteophytes in the mid-thoracic spine. (Tr. 444.)  The x-ray of her left foot showed a

possible fracture.  (Tr. 443.)

On February 18, 2014, Porter presented to orthopedist Shana Miskovsky, M.D., for

evaluation of her left foot pain.  (Tr. 458-461.)  She complained of left foot pain, sweats,

headaches, dizzy spells, arthritis, chronic cough, easy bruising, shortness of breath, nausea,

frequent diarrhea, urinary frequency, muscle cramps, sleep disturbances, depression, sinus

problems, and stomach problems.  (Tr. 458.)  On examination, Dr. Miskovsky noted normal

8

pulses, no pitting edema, intact sensation in Porter's lower extremities, and soreness/tenderness to palpation in the fourth and fifth toes of her left foot.  (Tr. 459-460.)  She assessed grade 2+ adult onset flat feet (*pes planus*), stress fracture of the metatarsal bone, toe sprain, and Kohler's disease.  (Tr. 460.)  Dr. Miskovsky prescribed a tall Cam Walker boot for four to six weeks.  (*Id.*) She further noted as follows:

> Her situation is complex in that she has adult onset flatfoot deformity with already arthritic changes of the talonavicular joint.  The radiologist was concerned that this may be an acute fracture of the dorsal navicular– the patient clinically has no pain or swelling in that area and also the appearance on x-ray is more chronic due to calcification pattern and ossicle and developments of the osteoarthritic changes of the talonavicular joint suggest a chronic process. * * * Unfortunately, her morbid obesity has a great deal of effect on her development of a collapsed arch and arthritis of her foot and contributes most likely to her difficulty controlling her blood sugars, which she reports to range in the 200s.  It is important that she follow up with her medical team to try to get her weight under better control or she may have to consult with the bariatric surgery department.

(Tr. 460.)

On August 14, 2014, Porter returned to Dr. Fuedo with complaints of "constant pain" in her left hand after falling down the steps a month previously.  (Tr. 463-468.)  She also reported cramping and locking up of the fingers on both her hands, as well as intermittent numbness throughout her bilateral hands and feet.  (Tr. 463.)  Porter reported worsening vision and acknowledged "she has not always [been] regular with her use of medication and has not been regularly following her diabetic diet."  (Tr. 463-464.)  On examination, Dr. Feudo noted full range of motion in Porter's fingers with increased pain in the PIP and DIP joints of her left hand; tenderness to palpation in those joints; diminished pinprick sensation in Porter's right upper extremity; decreased reflexes; positive Tinel's sign; negative Phalen's sign, and positive carpal compression in both hands.  (Tr. 466.)  He found her finger numbness, cramping, and locking up

9

"may be secondary to osteoarthritis, bilateral median neuropathy."  (Tr. 467.)  Dr. Feudo

prescribed wrist splints and ordered blood work.  (Tr. 468.)  Lab work showed high levels of

glucose (261) and hemoglobin A1c (11.8).  (Tr. 471, 472.)  It also revealed elevated c-reative

protein.  (Tr. 474.)

 Porter returned to Dr. Feudo on February 10, 2015.  (Tr. 493-497.)  She complained of

right shoulder pain radiating to her right elbow, left ankle pain, and sharp pain in her mid-

thoracic region.  (Tr. 493.)  On examination of Porter's right shoulder, Dr. Feudo noted decreased

range of motion with increased pain on flexion and rotation, positive Hawkin's sign, positive arm

crossover test, and positive impingement sign.  (Tr. 496.)  Examination of Porter's thoracic spine

revealed full range of motion with pain on flexion, and tenderness to palpation of the mid-

thoracic region.  (*Id*.)  Dr. Feudo found Porter's right shoulder pain "may be secondary to rotator

cuff tendinitis/tear, biceps tendinitis."  (*Id*.)  He ordered a right shoulder x-ray and stated "she

will probably require a referral to physical therapy and/or an orthopedic specialist for the

shoulder pain and mid-back pain."  (Tr. 497.)  Porter thereafter underwent an x-ray of her right

shoulder, which revealed no acute fractures, dislocations, or significant osseous abnormality.

(Tr. 507.)

 On July 16, 2015, Porter complained of "sensation of the heart racing," both at rest and

with mild exertion.  (Tr. 489-492.)  Dr. Feudo assessed possible tachycardia, arrthymia, and

anxiety.  (Tr. 492.)  He ordered an EKG and blood work.  (*Id*.)  Lab work showed high levels of

glucose (237) and hemoglobin A1c (13.2).  (Tr. 499, 500.)  It also revealed an elevated c-reative

protein level.  (Tr. 505.)

 Several days later, on July 21, 2015, Porter returned to Dr. Michalos for an eye

examination.  (Tr. 508-510.)  Dr. Michalos concluded Porter was a "glaucoma suspect based on optic nerve cupping."  (Tr. 509.)  He also assessed non-proliferative diabetic retinopathy and type 2 diabetes with opthalmic complications.  (*Id.*)

On August 3, 2015, Porter returned to Dr. Feudo reporting "chronic intermittent episodes of a sensation of the heart racing."  (Tr. 514-517.)  She also reported "chronic intermittent episodes of throbbing pain in the right lateral supraorbital region," with photophobia, phonophobia, vertigo, nausea, and lightheadedness.  (*Id.*)  Examination revealed abnormal heart palpation, along with diminished sensation in the right hand, diminished pinprick sensation in the right foot and right hand, and decreased reflexes.  (Tr. 516.)  Dr. Feudo ordered placement of a 48 hour Holter monitor, and prescribed Topamax.  (*Id.*)

Porter wore a Holter Monitor from August 18 to August 20, 2015 to evaluate possible coronary problems.  (Tr. 519.)  This testing revealed sinus bradyarrthymias/sinus arrhythmia, and supraventicular ectopic activity.  (*Id.*)

## C.    State Agency Reports

On September 13, 2013, state agency physician Jeffrey Vasiloff, M.D., reviewed Porter's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 107-109.)  He found Porter could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (*Id.*)  Dr. Vasiloff also concluded Porter could frequently stoop, kneel, and crouch; occasionally climb ramps and stairs; occasionally crawl; and never climb ladders, ropes, and scaffolds.  (*Id.*)  In addition, Porter had an unlimited capacity to balance and push/pull.  (*Id.*) Dr. Vasiloff found Porter should not engage in overhead reaching bilaterally.  (*Id.*)  Finally, he

11

concluded Porter should avoid all exposure to hazards.  (*Id.*)

On February 14, 2014, Porter underwent a consultative examination with Hasan Assaf,

M.D.  (Tr. 446-455.)  She reported the following symptoms:

> The claimant states that she has been having low back pain since 2004.  The pain
> is present all the time, and it is 9/10.  The pain travels to both legs and is associated
> with numbness in both legs. The pain is worse with standing, walking, bending,
> lifting, and with any movement.  She was seen by her doctor at University
> Hospitals of Cleveland, and x-rays and MRIs were done at University Hospitals.
> She was told that she has disc disease.  She had two sessions of physical therapy
> which did not improve her pain.  She was prescribed pain medication which she
> continues to take with some improvement in her symptoms.

> She started having neck pain in 2008.  The pain is present all the time and is 9/10.
> The pain initially traveled down to the right shoulder, but recently started going
> down the left shoulder as well.  The pain is worse with movement of the neck and
> also with lifting and reaching with the right or left arm, but mostly with the right
> arm.  She was seen by her doctor at University Hospitals of Cleveland.  An MRI
> of the neck was done at University Hospitals.  She was told that she has a disc
> problem and was prescribed the same pain medication that she is using for her low
> back pain.

> The claimant started having pain in both knees two years ago. The pain is present
> all the time, but is worse with standing and walking.  The pain is 9/10.  She was
> seen by her doctor recently, and x-rays of both the right and left knees were done
> three weeks ago at University Hospitals in Highland Heights [sic].  She was told
> by her doctor that the x-rays showed arthritis.  She was prescribed a new pain
> medication yesterday which has not been filled yet.

> * * *

> She has been having numbness in both hands and feet for more than two years.
> She was told by her doctor that this could be the result of diabetes mellitus, and she
> was prescribed Cymbalta with some improvement of her symptoms.

> The claimant has been wearing eyeglasses all her life.  She has noticed that her
> vision is getting worse lately.  She had an eye examination done four weeks ago,
> and she was prescribed new glasses which she is currently using.  She states that
> with the new glasses, she can read, but with difficulty, and her far vision is still not
> very good.

(Tr. 446-447.)  Porter also complained of frequent headaches (three times per week) and chest

pain on exertion.  (Tr. 448.)

On examination, Porter was in no acute distress but "limped on the left because of [her] recent foot fracture."  (Tr. 449.)  Her stance was normal, she used no assistive devices, she needed no help changing for the exam or getting on/off the exam table, and she was able to rise from a chair without difficulty.  (*Id.*)  Dr. Assaf further noted no scoliosis, kyphosis, or abnormality in Porter's thoracic spine.  (*Id.*)  He did observe positive straight leg raise bilaterally at 30 degrees and tenderness over Porter's left foot and right knee, but no edema.  (Tr. 449-450.)  Porter's reflexes were normal, and no sensory deficit was noted.  (Tr. 450.)

Manual muscle testing of Porter's bilateral shoulders, elbows, wrists, and fingers was normal, as was her ability to grasp, manipulate, and pinch.  (Tr. 452.)  Range of motion in her elbows, wrists, and hands/fingers was normal.  (Tr. 454.)  There was no evidence of muscle spasms, primitive reflexes, or muscle atrophy.  (Tr. 453.)  However, Dr. Assaf did find decreased range of motion in Porter's cervical spine, right shoulder, bilateral knees, and dorsolumbar spine.  (Tr. 453-455.)

Dr. Assaf diagnosed (1) chronic low back pain, probably lumbar disc disease; (2) neck and bilateral shoulder pain (right more than left), probably muscle strain; (3) bilateral knee pain, cause unknown; (4) recent left foot pain (recent fracture by history); (5) bilateral hand and foot numbness, probably peripheral diabetic neuropathy; (6) diabetes mellitus; (7) hypertension; (8) eye refraction disorder; (9) chest pain on exertion, cause unknown; and (10) obesity.  (Tr. 450.)  He described Porter's prognosis as "guarded."  (*Id.*)  Dr. Assaf concluded as follows:

> MEDICAL SOURCE STATEMENT:  There are marked limitations in activities requiring prolonged standing, walking, bending, squatting, and lifting. There are moderate limitations in activities requiring reaching and lifting with the right arm.

13

(*Id.*)

On March 3, 2014, state agency physician Robert Wysokinski, M.D., reviewed Porter's medical records and completed a Physical RFC Assessment.  (Tr. 121-123.)  He concluded Porter could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 4 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (*Id.*)  Dr. Wysokinski also concluded Porter could frequently stoop, kneel, crouch, and balance; occasionally climb ramps and stairs; occasionally crawl; and never climb ladders, ropes, and scaffolds.  (*Id.*)  In addition, Porter had an unlimited capacity to push/pull.  (*Id.*)  Dr. Wysokinski found Porter was limited to occasional overhead reaching on the right in light of evidence of decreased range of motion in her right shoulder, neck pain, disc bulges in her cervical spine, cervical spinal arthritis, and chronic pain.  (*Id.*)  Finally, he concluded Porter should avoid all exposure to unprotected heights, hazardous machinery, and commercial driving.  (*Id.*)

**D.    Hearing Testimony**

During the September 23, 2015 hearing, Porter testified to the following:

- She obtained her GED in 1986, and attended two years of college.  (Tr. 79-80.)  She did not get a college degree because she had to leave due to "lack of funds."  (Tr. 80.)  She also has training as a cosmetologist.  (Tr. 80-81.)  She last had her cosmetology license in 2014.  (Tr. 81.)

- She lives with her three children, ages 15, 16, and 18.  (Tr. 81.)  Her children help with the housework, including doing the dishes, sweeping, cooking, and laundry.  (Tr. 81-82.)  She goes grocery shopping with her children, but rides in the motorized cart due to back spasms.  (Tr. 83.)  She can drive a car for a short period of time, i.e., no more than 15 to 20 minutes.  (Tr. 82.)  If she drives for longer than that, her knees "lock up" and cause "extreme pain."  (*Id.*)

- Her worst pain is in her back and knees.  (Tr. 87.)  She is in constant pain, which is exacerbated by "any kind of activity."  (*Id.*)  She takes muscle relaxants and pain pills.  (Tr. 88.)  The muscle relaxants ease the pain "slightly."  (*Id.*)  The pain pills are effective but she tries not to take them often because they make her

14

sleepy and "knock her out." (*Id.*) She can go "maybe two days" before taking pain medication. (*Id.*)

- She relieves her knee pain by stretching. (Tr. 82-83, 89.) There is nothing she can do about her back pain. (Tr. 89.) She also experiences back spasms, which feel like "a big weight" hitting her in the back. (Tr. 84.) She can stand or walk for about 10 minutes before experiencing a back spasm. (Tr. 83.) There is nothing she can do but sit down and wait for the pain to subside. (Tr. 84.) Her spasms have caused her to fall down at home. (*Id.*)

- She also experiences pain in her right ankle. (Tr. 89-90.) Her ankle aches if she walks or stands too much. (*Id.*) She has a boot that extends from her foot to her knee, but it is very hard to walk in the boot. (*Id.*) She also experiences ankle pain at night. (*Id.*)

- She suffers from pain in her hands and fingers. (Tr. 90-91.) In particular, she described pain in two fingers on her left hand and her "whole right hand." (*Id.*) She also has a "trick finger" on her right hand that cramps up and won't bend. (*Id.*) All of her fingers cramp up "at any given time if [she's] doing too much," especially when writing and typing. (*Id.*)

- She suffers from diabetes and has had glucose readings as high as 300. (Tr. 91.) She experiences neuropathy in her feet and hands a "couple times per week." (Tr. 92.) She is obese and was 5'5" and 252 pounds at the time of the hearing. (Tr. 91.)

- Because of her hand pain/cramping and neuropathy, she has difficulty using her hands. (Tr. 93.) She can brush her teeth, but she cannot do her own hair. (*Id.*) She can get dressed but her daughter helps her put on her shoes. (*Id.*) She can button buttons and put on earrings, but has trouble holding on to a knife and fork. (*Id.*) Generally, she can hold something for only a few minutes before her hands cramp up. (Tr. 93-94.)

- On a typical day, she watches television, helps her kids with homework, and reads magazines. (Tr. 85.) She can use a computer but not for very long because her hands cramp up. (*Id.*) She cannot read for a long period of time because of her migraines. (*Id.*) Occasionally, she goes to a restaurant. (Tr. 86.) She attends Church and Bible Study. (*Id.*) Her Bible Study class lasts 45 minutes. (*Id.*)

The VE testified Porter had past work as a sales clerk (light, semiskilled, SVP 3). (Tr. 96.) The ALJ then posed the following hypothetical question:

15

> If you would consider a person of the claimant's age, education, and past relevant work experience with the capacity for light work, but with standing and walking limited to four hours of eight, sitting six hours of eight; climbing ramps and stairs occasionally; climbing ladders, ropes, or scaffolds never; balancing, stooping, kneeling, crouching frequently; crawling occasionally; with the capacity to reach overhead with the right upper extremity occasionally; but who would have to avoid all exposure to hazards defined as industrial machinery, unprotected heights, and similar things.  Would that individual be able to perform the type of work claimant performed in the past?

(Tr. 96.)

The VE testified the hypothetical individual would not be able to perform Porter's past work as a sales clerk, but would be able to perform other representative jobs in the economy, such as office helper (light, unskilled, SVP 2); information clerk (light, unskilled, SVP 2); and order taker (light, unskilled, SVP 2).  (Tr. 96-97.)

Porter's attorney then asked the VE to assume the above hypothetical with the additional limitation that "there would only be occasional handling and fingering."  (Tr. 98.)  The VE testified there would be no jobs for such a hypothetical individual.  (*Id*.)  Finally, Porter's attorney asked the VE to assume the first hypothetical with the additional limitation that "the individual would need to miss work at least two or more days on a regular and ongoing basis."  (*Id.*)  The VE testified there would be no jobs available for such a hypothetical individual.  (*Id.*)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of

16

a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since June 17, 2013, the application date (20 CFR 416.971 et seq.)

2.    The claimant has the following severe impairments: degenerative disc disease of the cervical, lumbar, and thoracic spine; migraines; diabetes mellitus; and obesity (20 CFR 416.920(c)).

17

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she is able to stand and/or walk four hours in an 8-hour workday; she can sit for about six hours in an 8-hour workday; she can occasionally climb ramps and stairs; she can never climb ladders, ropes or scaffolds; she can frequently balance, stoop (i.e. bend at the waist), kneel, or crouch (i.e. bend at the knees); she can occasionally crawl; she can occasionally reach overhead with the right upper extremity; she should avoid all exposure to hazards (defined as industrial machinery, unprotected heights, etc.).

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on November ** 1964 and was 48 years old, which is defined as a younger individual age 18-49 on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since June 17, 2013, the date the application was filed (20 CFR 416.920(g)).

(Tr. 58-70.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the

Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### Step Two

In her first assignment of error, Porter argues the ALJ erred in finding her hand

impairments were not "severe" at step two of the sequential evaluation.  (Doc. No. 12 at 12.)  She maintains objective clinical examination findings show she had tenderness to palpation of her hand joints, decreased sensation in her right upper extremity, decreased reflexes, positive Tinel's and positive Phalen's signs, as well as positive bilateral carpal compression signs.  (*Id*. at 13.)  Porter also notes she was instructed to buy wrist splints and her blood work routinely showed elevated inflammatory markers (i.e., sedimentation rate and c-reactive protein).  (*Id.*)  She maintains the ALJ improperly ignored the above evidence and failed to adequately explain why she failed to recognize Porter's hand impairments as "severe."  (*Id.* at 12-14.)

The Commissioner argues substantial evidence supports the ALJ's step two finding.  (Doc. No. 13 at 16-18.)  She maintains the ALJ considered Porter's claims of hand numbness and difficulty writing and properly determined her allegations were not supported by the record.  (*Id*.)  The Commissioner further asserts any error is harmless because the ALJ determined Porter had several severe impairments at step two and proceeded at step four to consider the combined effects of all of her impairments in formulating the RFC, including Porter's hand impairments.  (*Id*.)

At step two of the sequential evaluation, an ALJ must determine whether a claimant has a "severe" impairment.  *See* 20 C.F.R. §§ 404.1520(a) (40(ii) & 416.920(a)(4)(ii).  To determine if a claimant has a severe impairment, the ALJ must find that an impairment, or combination of impairments, significantly limits the claimant's physical or mental ability to do "basic work activities."  *See* 20 C.F.R. § 416.920(c).  "An impairment ... is not severe if it does not significantly limit your physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1521(a) & 416.921(a).  Basic work activities are defined as "the abilities and aptitudes

necessary to do most jobs," and include: (1) physical functions such as standing, sitting, lifting,

handling, etc.; (2) the ability to see, hear and speak; (3) understanding, carrying out, and

remembering simple instructions; (4) use of judgment; (5) responding appropriately to

supervision, co-workers, and usual work situations; and, (6) dealing with changes in a routine

work setting.  20 C.F.R. §§ 404.1521(b) & 416.921(b).

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle,"

*Rogers*, 486 F.3d at 243 n. 2, intended to "screen out totally groundless claims."  *Farris v. Sec'y*

*of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 2008

WL 508008 at * 5 (6th Cir. Feb. 22, 2008).  Thus, if an impairment has "more than a minimal

effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."

SSR 96–3p, 1996 WL 374181 at *1 (July 2, 1996).  However, if an ALJ makes a finding of

severity as to just one impairment, the ALJ then "must consider limitations and restrictions

imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p,

1996 WL 374184 at *5.  This is because "[w]hile a 'not severe' impairment(s) standing alone

may not significantly limit an individual's ability to do basic work activities, it may--when

considered with limitations or restrictions due to other impairments--be critical to the outcome of

a claim."  *Id*.  "For example, in combination with limitations imposed by an individual's other

impairments, the limitations due to such a 'not severe' impairment may prevent an individual

from performing past relevant work or may narrow the range of other work that the individual

may still be able to do."  *Id*.

When the ALJ considers all of a claimant's impairments in the remaining steps of the

disability determination, the failure to find additional severe impairments at step two does "not

22

constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec.*, 2009 WL 4981686 at * 2 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at step two (i.e. an ALJ finds that a claimant has established at least one severe impairment) and claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony*, 2008 WL 508008 at * 5.

Here, the ALJ determined, at step two, that Porter suffered from the severe impairments of degenerative disc disease of the cervical, lumbar, and thoracic spines; migraines; diabetes mellitus; and obesity.  (Tr. 60.)  The ALJ then determined Porter's knee pain, stress fracture of the metatarsal bone and mild non-proliferative diabetic retinopathy placed "no more than a minimal limitation on her ability to perform basic work activities" and, therefore, were "not severe."  (*Id.*)  Finally, the ALJ determined Porter's fibromyalgia was not a medically determinable impairment.  (Tr. 61-62.)

The ALJ did not discuss whether Porter's hand numbness, tingling, or pain constituted "severe" impairments at step two.  At step four, however, the ALJ discussed evidence regarding Porter's hand impairments, including her self-reports, hearing testimony, and the medical and opinion evidence.  (Tr. 63-68.)  In particular, the ALJ acknowledged Porter's testimony that her hand numbness and finger "locking" make it hard for her to write or use the computer.  (Tr. 63-64.)  The ALJ also noted Porter's complaints of pain and "disabling neuropathy" in her hands.  (Tr. 64.)  The ALJ then discussed the presence of positive examination findings (including positive Tinel's, positive carpel compression signs in both hands, and decreased motor strength

and sensation), but found treatment for Porter's hand impairments "has been relatively routine and conservative in nature."  (Tr. 64-66.)  The ALJ also noted Porter's testimony she only experiences numbness in her hands "a few times per week."  (Tr. 64.)  Finally, in discussing the opinion evidence, the ALJ noted the only manipulative restriction offered by Drs. Assaf, Vasiloff, and Wysokinski was a limitation to occasional overhead reaching on the right.  (Tr. 67-68.)  The RFC includes this restriction, but does not contain any other manipulative limitations. (Tr. 63.)

While it would have been preferable for the ALJ to expressly consider whether Porter's hand impairments were "severe" at step two, any error in her failure to do so is harmless.  As noted above, the ALJ proceeded at step four of the sequential evaluation process to consider the cumulative effects of Porter's physical impairments, both severe and non-severe, including her hand impairments.  The record reflects Porter testified about her hand numbness, tingling, pain and finger "locking" during the September 2015 hearing.  (Tr. 90-93.)  At step four, the ALJ indicated she had "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Tr. 63.)  Moreover, at this step, the ALJ expressly acknowledged (1) Porter's testimony she experiences hand pain, numbness, tingling, cramping, and finger "locking;" (2) treatment records documenting Porter's continued complaints of hand tingling, numbness, and pain; and (3) clinical examination findings relating to her hand impairments, including diminished sensation, positive Tinel's and positive carpel tunnel compression sign.  (Tr. 64-66.)  The ALJ also noted there was no treating source opinion regarding Porter's work-related limitations, which would include any

24

treating opinions relating to her hand impairments.[5]  (Tr. 67.)

Accordingly, the Court finds the ALJ considered Porter's hand impairments at later steps in the decision and, therefore, any error at step two is harmless.  This assignment of error is without merit.

*RFC*

Porter next argues the ALJ's finding she could perform a reduced range of light work is not supported by substantial evidence.  (Doc. No. 12 at 14-17.)  Specifically, Porter notes the ALJ purported to give Dr. Assaf's opinion "great weight" (including his opinion Porter had "marked limitations" in prolonged standing, walking and lifting) but nonetheless found she was capable of standing and walking four hours per day and lifting and carrying 20 pounds occasionally.  (*Id*.)  Porter asserts "it is simply arbitrary for the ALJ to accept a marked limitation in prolonged standing, walking and lifting but still allow for a person to be on their feet for four hours a day." (*Id*.)  She further maintains the ALJ fails to explain this inconsistency, either with respect to the RFC's standing/walking limitation or the lifting/carrying limitation.  (*Id*.)  Lastly, Porter asserts the ALJ failed to adequately account for her level III obesity in fashioning the RFC.  (*Id*.)

The Commissioner argues the RFC is supported by substantial evidence, including the

---

[5] Porter does not direct this Court's attention to any medical opinion evidence indicating her hand impairments result in greater manipulative limitations than those set forth in the RFC.  In fact, the Court notes neither Dr. Vasiloff or Dr. Wysokinski found Porter had any limitations in her abilities to finger, handle, or feel.  (Tr. 107-109, 121-123.)  Moreover, Dr. Assaf specifically found Porter had no limitations in her abilities to pick up a coin, key, write, hold a cup, open a jar, button/unbutton, zipper or open a door.  (Tr. 453.)  In addition, manual muscle testing of Porter's wrists and fingers was normal, as was testing of her abilities to grasp, manipulate, and pinch.  (Tr. 452.)

opinions of state agency physicians Drs. Vasiloff and Wysokinski.  (Doc. No. 13 at 20.)  She

maintains the RFC is "based on all the evidence of record, not just the consultative examiner's

report," noting "[t]he ALJ is not limited to choosing between competing opinions in the record

but may instead develop his or her own functional capacity."  (*Id*.)  The Commissioner further

asserts the ALJ appropriately accounted for Dr. Assaf's opinion by restricting Porter to jobs that

would require her to be on her feet four hours or less during the workday.  (*Id.*)  Lastly, the

Commissioner argues the ALJ recognized and properly accounted for both Porter's obesity and

her hand limitations in formulating the RFC.  (*Id*. at 21-22.)

The RFC determination sets out an individual's work-related abilities despite his or her

limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an

administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An

ALJ "will not give any special significance to the source of an opinion on issues reserved to the

Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for

assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and

must consider all of a claimant's medically determinable impairments, both individually and in

combination.  *See* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence

upon which he is relying, and he may not ignore evidence that does not support his decision,

especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774

F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec*., 383 Fed.Appx. 140, 148 (3d Cir. 2010)

("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual

functional capacity determination,' and must also 'mention or refute [...] contradictory, objective

medical evidence' presented to him.")).  *See also* SSR 96–8p, 1996 WL 374184 at * 7 ("The

RFC assessment must always consider and address medical source opinions.  If the RFC

assessment conflicts with an opinion from a medical source, the adjudicator must explain why

the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well

established that the claimant bears the burden of establishing the impairments that determine his

RFC.  *See Her*, 203 F.3d at 391.

  As noted above, the ALJ determined, at step two, that Porter suffered from the severe

impairments of degenerative disc disease of the cervical, lumbar, and thoracic spines; migraines;

diabetes mellitus; and obesity.  (Tr. 60.)  After determining Porter's impairments did not meet or

equal the requirements of a listing at step three, the ALJ proceeded to consider Porter's testimony

and the medical and opinion evidence at step four.  (Tr. 62-68.)

  The ALJ first acknowledged Porter's testimony she cannot stand or walk for any length

of time due to "extreme pain" and neuropathy, as well as her testimony she suffers from bilateral

hand pain, numbness, and cramping.  (Tr. 63-64.)  The ALJ then discussed the medical evidence

regarding her physical impairments.  She found Porter's treatment history was inconsistent with

her allegations of disabling neuropathy in her hands and feet, citing her "routine and

conservative" treatment history and Porter's testimony she only suffers hand numbness a few

times per week.  (Tr. 64.)  The ALJ also rejected Porter's testimony she can only stand or walk

for 10 minutes at a time, noting she does not use an assistive device; her knee x-rays were

unremarkable; and she was able to wash and dress herself, attend church and Bible study, and go

to restaurants.  (*Id*.)  Finally, the ALJ acknowledged positive clinical examination findings as

noted in Dr. Feudo's treatment records, but also cited objective imaging results showing only

mild to moderate degenerative changes in Porter's thoracic and lumbar spines. (Tr. 64-66.)

The ALJ weighed the opinion evidence as follows:

As for the opinion evidence, no treating source has offered an opinion regarding the claimant's work related limitations, or suggested that the claimant has disabling impairments.

On September 13, 2013, state agency medical consultant Dr. Jeffrey Vasiloff, M.D. opined that the claimant could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds (Ex. 2A/5). She could stand and/or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. She could occasionally climb ramps and stairs and never climb ladders, ropes and scaffolds. She could frequently stoop, kneel, crouch and occasionally crawl. She cannot reach overhead bilaterally and she should avoid all exposure to hazards (Ex. 2A/6). The undersigned gives some weight to this opinion. However, the opinion of Dr. Wysokinski below is more consistent with the examination findings and objective diagnostic evidence as a whole because Dr. Vasiloff did not have the benefit of reviewing the entire medical record before formulating his opinion.

On March 3, 2014, state agency medical consultant Dr. Robert Wysokinski, M.D. opined that the claimant could occasionally lift and/or carry 20 pounds, and frequently lift and/or carry 10 pounds (Ex. 4A/9). She could stand and/or walk 4 hours in an 8-hour workday. She can sit about 6 hours in an 8-hour workday. She can occasionally climb ramps and stairs and never climb ladders, ropes or scaffolds (Ex. 4A/10). She can frequently balance, stoop, kneel or crouch (Ex. 4A/10). She can occasionally crawl. She can occasionally reach overhead on the right. She should avoid all exposure to hazards (Ex. 4A/11). Dr. Wysokinski opined that the claimant would have no visual limitations because her vision was 20/40 in both eyes with correction (Ex. 4A/11, 12). The undersigned gives great weight to the opinion of Dr. Wysokinski because his opinion is consistent with the objective diagnostic testing results which were unremarkable in the knees (Ex. 3F/62) but showed a broad based disc bulge in the claimant's cervical spine (lF/4), and degenerative changes in the lumbar spine (Ex. 3F/47).

* * *

Consultative examiner Dr. Hasan Assaf opined that she had marked limitation in activities requiring prolonged standing, walking, bending, squatting and lifting. She had moderate limitations in activities requiring reaching and lifting with the right arm (Ex. 6F/6). The undersigned gives great weight to the opinion of Dr. Assaf as it is consistent with the objective diagnostic findings that her knees were unremarkable (Ex. 3F/62) and that she had a broad based disc bulge in the cervical spine (Ex. l F/4) and degenerative changes in her lumbar spine (Ex. 3F/47). This

opinion is also generally consistent with the opinions of the state agency medical consultants.

In sum, the above residual functional capacity assessment is supported by the objective diagnostic findings from MRIs and x-rays, the physical examination findings of both the consultative examiner and treating physicians, and the opinions of the state agency medical consultants.

(Tr. 67-68.)  The ALJ formulated the following RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work[6] as defined in 20 CFR 416.967(b) except that she is able to stand and/or walk four hours in an 8-hour workday; she can sit for about six hours in an 8-hour workday;  she can occasionally climb ramps and stairs;  she can never climb ladders, ropes or scaffolds; she can frequently balance, stoop (i.e. bend at the waist), kneel, or crouch (i.e. bend at the knees); she can occasionally crawl; she can occasionally reach overhead  with the right upper extremity; she should avoid all exposure to hazards (defined as industrial  machinery, unprotected heights, etc.).

(Tr. 63.)

For the following reasons, the Court finds the RFC is not supported by substantial evidence.  The ALJ acknowledged Dr. Assaf's opinion Porter had "marked limitation in activities requiring prolonged standing, walking, bending, squatting and lifting," and purported to accord this opinion "great weight" on the grounds it was consistent with objective diagnostic findings and "generally consistent" with the opinions of Drs. Vasiloff and Wysokinski.  (Tr. 68.)

---

[6] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b).  Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

However, the ALJ fails to explain how a "marked limitation" in prolonged standing and walking is consistent with her RFC assessment that Porter is capable of standing and/or walking for four hours in an 8 hour workday; i.e., 50% of the workday. (Tr. 63.) Nor does the ALJ explain how a "marked limitation" in bending, squatting and lifting is consistent with the ALJ's findings Porter is capable of frequent stooping (bending at the waist); frequent crouching (bending at the knees), and lifting and carrying up to 20 pounds occasionally and 10 pounds frequently. (*Id*.)

This is problematic because, according to SSR 83-10, the term "occasionally" means occurring "very little up to one-third of the time." SSR 83-10, 1983 WL 31251 at * 5. The term "frequently" means "occurring from one-third to two-thirds of the time." *Id*. at * 6. Thus, in an eight hour workday, the ability to perform an activity "occasionally" means the ability to perform that activity for up to 2.6 hours, whereas the ability to perform an activity "frequently" means the ability to perform that activity for 2.6 to 5.3 hours during an 8 hour workday. Here, the ALJ found Porter could walk and/or stand for 4 hours, and could bend and squat for up to 5.3 hours (i.e., "frequently"), despite the fact she accorded "great weight" to Dr Assaf's opinion Porter was "markedly limited" in these areas. The ALJ fails to acknowledge or directly address this inconsistency at any point in the decision.

Nor does the ALJ's stated basis for according "great weight" to Dr. Assaf's opinions shed any light on the ALJ's reasoning. Specifically, the ALJ finds Dr. Assaf's opinion of marked limitations was entitled to "great weight" because "it is consistent with the objective diagnostic findings that her knees were unremarkable (Ex. 3F/62) and that she had a broad based disc bulge in the cervical spine (Ex. l F/4) and degenerative changes in her lumbar spine (Ex. 3F/47)." (Tr. 68.) The Court finds this reason fails to clarify the ALJ's weighing of Dr. Assaf's opinion. It

30

simply does not make sense the ALJ would accord "great weight" to Dr. Assaf's opinion of *marked* limitations in standing, walking, bending, and squatting because it is consistent with *normal* knee x-rays.  Nor is it logical that Dr. Assaf's opinion could be consistent with both *normal* knee x-rays and *abnormal* imaging showing broad-based disc bulges in Porter's cervical spine and degenerative changes in her lumbar spine.

Nonetheless, the Commissioner asserts remand is not required because the RFC is consistent with the opinion of state agency physician, Dr. Wysokinski.  While that may be the case, the fact remains the ALJ's treatment of Dr. Assaf's opinion in internally inconsistent and, frankly, confusing.  As courts within this Circuit have routinely noted, an ALJ decision cannot be upheld, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877.  Here, the inconsistencies in the ALJ's treatment of Dr. Assaf's opinion hinders the Court's ability to engage in a meaningful review of the ALJ's RFC assessment.  Remand is required to allow the ALJ the opportunity to articulate a meaningful analysis of the medical and opinion evidence at step four.

### Sentence Six Remand

Porter next argues remand is required under sentence six because new and material evidence submitted to the Appeals Council shows a worsening of her back pain and hand impairments.  (Doc. No. 12 at 17-20.)  Specifically, she notes an MRI dated two months after the ALJ decision, which shows disc herniations at every level of Porter's thoracic spine.  (*Id*. citing Tr. 34-35.)  Porter argues this MRI is both new and material, as it was not available at the time of the hearing and supports her prior reports of chronic back pain throughout the relevant time

31

period.  (Doc. No. 12 at 18.)  She also cites treatment records submitted to the Appeals Council after the hearing showing treatment for hand pain and finger locking, including injections.  (*Id.*)  Noting she is over 50 years old, Porter argues "the ALJ's RFC was the most restrictive it could possibly be, without reducing it to a sedentary RFC, thus additional evidence supporting Ms. Porter's reports of severe back pain could, with reasonable probability, tip the RFC assessment of the ALJ from standing and walking 4 hours down to 2 hours," which would result in a sedentary RFC and finding of disability.  (*Id.*)

The Commissioner argues remand is not required under sentence six because Porter "cannot show that a different outcome would be likely if the evidence were before the Commissioner at the time of her decision."  (Doc. No. 13 at 24.)  Specifically, she asserts "[a]s the Appeals Council explained, Dr. Feudo's treatment records from 2016 are not applicable to the alleged period of disability at issue, and would not affect the decision of whether plaintiff was disabled prior to November 17, 2015."  (*Id.*)

The Sixth Circuit has repeatedly held that "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in sentence six of 42 U.S.C. § 405(g). *Id.  See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of Soc. Sec.*, 529 Fed. Appx. 706, 717 (6th Cir. July 9, 2013) (stating "we view newly submitted evidence only to determine whether it meets the requirements for sentence-six remand"). Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g) (emphasis added).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' " *Foster*, 279 F.3d at 357 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)).  Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Id*. (quoting *Sizemore v. Sec'y of Health & Human Servs*., 865 F.2d 709, 711 (6th Cir.1988)).  *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir.2007) (noting evidence is "material" if it "would likely change the Commissioner's decision."); *Courter v. Comm'r of Soc. Sec*., 2012 WL 1592750 at * 11 (6th Cir. May 7, 2012) (same).  Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the administrative hearing.  *See Prater v. Comm'r of Soc. Sec*.,235 F. Supp.3d 876, 880 (N.D. Ohio 2017).  *See also Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 478 (6th Cir.2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec*., 2013 WL 5613751 at * 3 (6th Cir. Oct.15, 2013) (same).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. *See also Willis v. Sec'y of Health & Hum. Servs.*, 727 F.2d 551, 554 (6th Cir. 1984). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter*, 2012 WL 1592750 at * 11. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain evidence prior to the hearing.'" *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)). This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 2012 WL 1592750 at * 11. *See also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant. *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). When a district court grants remand pursuant to sentence six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand [s] for further fact-finding." *Courter*, 2012 WL 1592750 at * 11. *See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also Melkonyan*, 501 U .S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

The record reflects Porter submitted the following evidence to the Appeals Council. (Tr. 1-45.) On January 20, 2016, two months after the ALJ decision, Porter returned to Dr. Feudo with complaints of "chronic constant sharp pain in the mid-thoracic region," increased

34

since her last office visit.  (Tr. 29-33.)  She also reported sharp pain in her right third finger, as well as a "locking up" of the same finger with use of her hand.  (Tr. 29.)  Dr. Feudo ordered an MRI of Porter's thoracic spine, and referred her to an orthopedist for evaluation and treatment of her right hand "trigger finger."  (Tr. 33.)

Porter underwent the MRI on January 28, 2016.  (Tr. 34-35.)  It revealed disc herniations in Porter's cervical spine at the C3-C4, C4-C5, C5-C6, and C6-C7 levels.  (*Id*.)  This imaging also showed disc herniations at every level of Porter's thoracic spine (T1-T2, T2-T3, T3-T4, T4-T5, T5-T6, T6-T7, T7-T8, T8-T9, T9-T10, and T10-T11) with narrowing of the subarachnoid spaces.  (*Id*.)

On May 25, 2016, Porter returned to Dr. Feudo with complaints of constant pain in her knees and mid-thoracic region.  (Tr. 24-28.)  With regard to her mid-thoracic pain, Porter reported increased pain since completing a recent course of physical therapy, as well as increased pain with prolonged standing or walking.  (Tr. 24.)  Porter also complained of continued episodes of her right third finger "locking up."  (*Id*.)  She stated she received a steroidal injection on May 20, 2016, which resulted in a decrease in frequency of her finger locking episodes.  (*Id*.)  Dr. Feudo increased her dosage of Topamax.  (Tr. 28.)

On August 26, 2016, Porter complained of daily headaches with associated nausea, phonophobia, and photophobia.  (Tr. 18-23.)  Dr. Feudo prescribed Verapamil.  (Tr. 22.)  He also noted Porter's HA1c was high, at 11.2%.  (Tr. 22, 37.)  Several months later, Porter returned to Dr. Feudo for treatment of a burn on her right foot.  (Tr. 12-17.)  At that time, she was "concerned in that her bariatric surgeons want her hemoglobin A1c to be 9% or less before they will do any surgery." (Tr. 12.)  Porter's glucose was very high that date, at 257.  (T. 36.)  Dr.

35

Feudo increased her diabetes medication, Lantus.  (Tr. 16.)

Because the undersigned has recommended this matter be remanded under sentence four for further consideration of the evidence in fashioning the RFC, the Court need not determine whether the above evidence is sufficient to warrant a remand under sentence six.  However, it is recommended that, on remand, ALJ should consider whether the above records submitted by Porter to the Appeals Council regarding her treatment for back and hand pain (including the January 2016 MRI of her thoracic spine), as well as any other pertinent records, relate back to the time period under consideration, in making her decision about whether Porter retains the capacity to perform the physical functions currently set forth in the RFC.

## VII.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends the Commissioner's final decision be VACATED and the case REMANDED for further consideration consistent with this decision.

 s/Jonathan D. Greenberg
Jonathan D. Greenberg
United States Magistrate Judge

Date: March 2, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**